Bryan K. Weir, CA Bar #310964
Thomas R. McCarthy*
William S. Consovoy*
Cameron T. Norris*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423

*Application for admission
 pro hac vice forthcoming

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., DONALD J. TRUMP, in his capacity as a private citizen,<br><br>Plaintiffs,<br><br>v.<br><br>ALEX PADILLA, in his official capacity as California Secretary of State, and XAVIER BECERRA, in his official capacity as California Attorney General,<br><br>Defendants. | No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs Donald J. Trump for President, Inc. and Donald J. Trump, in his capacity as a private citizen, bring this action against Defendants Alex Padilla, in his official capacity as Secretary of State of California, and Xavier Becerra, in his official capacity as Attorney General of California, to have California's Presidential Tax Transparency and Accountability Act declared unconstitutional and to enjoin its enforcement. Plaintiffs allege as follows:

**INTRODUCTION**

1. The Constitution sets forth the qualifications for the President, Vice President, Senate, and House of Representatives. The Supreme Court has held that those qualifications are "exclusive" and that States do not have the power to "supplement" them with their own

requirements. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995).

2.   Likewise, the First Amendment (as applied against the States through the Fourteenth Amendment) limits what restrictions States can place on candidates seeking to be put on the ballot. Though States may exercise some control over elections, they cannot do so in a way that burdens a candidate's First Amendment rights. *See, e.g.*, *Anderson v. Celebrezze*, 460 U.S. 780, 794 n.18 (1983). And such restrictions must "regulate[] the procedural aspects of the election" or "require[] some initial showing of support." *Schaefer v. Townsend*, 215 F.3d 1031, 1038 (9th Cir. 2000). Any other restrictions violate the First Amendment.

3.   The First Amendment also bars States from passing laws to retaliate against an individual for his or her political associations or speech. States cannot pass legislation "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

4.   The Ethics in Government Act ("EIGA") requires presidential candidates to disclose extensive personal financial information, 5 U.S.C. App. 4 §§ 101(a); 5 U.S.C. App. 4 § 102, and expressly displaces all other similar federal or state disclosure laws. Specifically, it supersedes "any other provision of law or regulation with respect to the reporting of information required for purposes of preventing conflicts of interest or apparent conflicts of interest." 5 U.S.C. App. 4 § 107(b).

5.   The Democratic Party is on a crusade to obtain the President's federal tax returns in the hopes of finding something they can use to harm him politically. In their rush to join this crusade, California Democrats have run afoul of these restrictions on State power over federal elections.

6.   On July 30, 2019, California Governor Gavin Newsom signed into law the Presidential Tax Transparency and Accountability Act, also known as SB27. That law requires all candidates for President to disclose their previous five years of tax returns as a condition of appearing on a primary ballot. In passing the law, Governor Newsom and the Democrats in the California legislature who voted for it made clear that they were retaliating against President Trump for his political associations and speech.

Complaint for Declaratory and Injunctive Relief

7. Because SB27 adds an unconstitutional qualification to the fixed set of qualifications for the presidency in the Constitution, violates the First Amendment, and is preempted by the EIGA, the Court should enjoin its enforcement.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction because this action arises under the Constitution and laws of the United States, 28 U.S.C. § 1331, and alleges civil-rights violations, *id.* § 1343.

9. Venue is proper because a substantial part of the events or omissions giving rise to the claims occurred in this District, and the Defendants reside in this District. *Id.* § 1391.

## PARTIES

10. Plaintiff Donald J. Trump for President, Inc. is the principal committee for President Donald J. Trump's reelection campaign.

11. Plaintiff Donald J. Trump is the 45th President of the United States. He is a member of the Republican Party and will be seeking the Republican nomination for President in 2020. President Trump brings this suit in his capacity as a private citizen.

12. Defendant Alex Padilla is the Secretary of State of California. Defendant Padilla is the State of California's chief elections officer and oversees all elections within California. His job includes ensuring that all election laws and campaign disclosure requirements are enforced, certifying the official lists of candidates for elections, and certifying election results. He is sued in his official capacity.

13. Defendant Xavier Becerra is the Attorney General of California. Defendant Becerra is charged with the duty to see that the laws of California are uniformly and adequately enforced. He is sued in his official capacity.

# BACKGROUND

**I. Federal Law Sets Important Limitations on States' Ability to Legislate in the Arena of Federal Elections.**

**A. Under the Qualifications Clauses, States cannot impose their own qualifications for federal office.**

14. The Constitution sets forth the qualifications for the presidency in Article II, § 1, cl. 5. It provides: "No Person except a natural born Citizen … shall be eligible to the Office of President; neither shall any person be eligible to that Office who shall not have attained to the Age of thirty five Years, and been fourteen Years a Resident within the United States." A similar provision sets the qualifications for serving in Congress. *See* U.S. Const. art. I, § 2, cl. 2; Article I, § 3, cl. 3.

15. The Supreme Court has held that these are the *exclusive* qualifications for federal office. *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995). That is, the qualifications set forth in Article II are fixed; States do not "possess the power to supplement the exclusive qualifications set forth in the text of the Constitution." *Id.* at 827. A State's laws violate the Qualifications Clauses if they impose a "substantive qualification rendering a class of potential candidates ineligible for ballot position." *Id.* at 835.

16. To be sure, States have some power to set basic procedural requirements for federal elections. But States cannot rely on that power to "dress eligibility … in ballot access clothing" and render the Qualifications Clauses "empty formalism." *U.S. Term Limits*, 514 U.S. at 831.

**B. Under the First and Fourteenth Amendments, States cannot impose ballot access rules that infringe a candidate's freedom of political association.**

17. With respect to federal elections, States may only "issue procedural regulations," which includes the power to regulate the place and manner of elections. *Cook v. Gralike*, 531 U.S. 510, 523 (2001). That power includes regulating matters like "notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Id.* at 523-24. In other words, States can regulate only "requirements as to procedure and safeguards which experience

shows are necessary in order to enforce the fundamental right involved, ensuring that elections are 'fair and honest,' and that 'some sort of order, rather than chaos, is to accompany the democratic process.'" *Id.* at 524 (citation omitted).

18. States may not pass ballot-access laws that fall outside of these categories. This is particularly true for Presidential elections where "a State's enforcement of more stringent ballot access requirements … has an impact beyond its borders." *Anderson*, 460 U.S. at 795. "[I]n the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest," and States have a correspondingly "less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries." *Id.* at 794-95.

19. But even if election regulations fall outside the Qualifications Clauses and within a State's authority to regulate federal elections, those regulations still must comply with the First Amendment. The First Amendment, as incorporated against the States by the Fourteenth Amendment, protects the freedoms of speech and association. *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986). And it limits the types of restrictions that States can impose on ballot access. *See Anderson*, 460 U.S. at 794 n.18.

20. The Supreme Court has indicated that restrictions on the right to run for public office must be carefully examined, particularly when they impose significant burdens on the right of voters to cast ballots for the candidate of their choice, or on the candidate's rights under the First Amendment." *Matsumoto v. Pua*, 775 F.2d 1393, 1396 (9th Cir. 1985).

21. To that end, "the Supreme Court [has] developed a balancing test to resolve the tension between a candidate's First Amendment rights and the state's interest in preserving the fairness and integrity of the voting process." *Soltysik v. Padilla*, 910 F.3d 438, 444 (9th Cir. 2018). "This is a sliding scale test, where the more severe the burden, the more compelling the state's interest must be, such that 'a state may justify election regulations imposing a lesser burden by demonstrating the state has important regulatory interests.'" *Id.* at 445. "A regulation imposing 'severe' restrictions … is subject to strict scrutiny." *Id.* Regulations that "bar [a candidate] from office or the ballot altogether," "suffocate 'core political speech,'" or prohibit "endorsing … a

'standard bearer who best represents the party's ideologies and preferences'" are likewise subject to strict scrutiny. *Id.*

22.  "Ballot regulations 'that impose a lesser burden on speech rights' still must be 'reasonably related to achieving the state's important regulatory interests." *Id.* Such burdens "require an assessment of whether alternative methods would advance the proffered governmental interests." *Id.*

**C. Under the First Amendment, States cannot discriminate or retaliate against individuals for their speech or politics.**

23.  States likewise cannot impose ballot access rules to retaliate against political opponents. "[P]olitical belief and association constitute the core of those activities protected by the First Amendment," *Elrod v. Burns*, 427 U.S. 347, 356 (1976), and the First Amendment "has its fullest and most urgent application to speech uttered during a campaign for political office." *Citizens United v. FEC*, 558 U.S. 310, 339-40 (2010).

24.  Because a State cannot "produce a result which it could not command directly," laws that do not directly regulate speech or association still violate the First Amendment if they "deny a benefit to a person because of his constitutionally protected speech or associations." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *accord Rutan v. Republican Party of Ill.*, 497 U.S. 62, 78 (1990). This is true even if the person "has no 'right' to [the] governmental benefit." *Perry*, 408 U.S. at 597. And the withheld benefit can be something "as trivial as failing to hold a birthday party." *Rutan*, 497 U.S. at 75 n.8. "[T]he government's reason for [acting] is what counts." *Heffernan v. City of Paterson*, 136 S. Ct. 1412, 1418 (2016).

25.  Accordingly, a law violates the First Amendment if it was enacted to discriminate or retaliate against an individual for his protected speech. "Official reprisal for protected speech offends the Constitution." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Laws "based on the identity of the speaker" are "instruments to censor"; they "run the risk that 'the State has left unburdened those speakers whose messages are in accord with its own views.'" *Citizens United*, 558 U.S. at 340; *NIFLA v. Becerra*, 138 S. Ct. 2361, 2378 (2018). At bottom, States cannot pass legislation "when the specific motivating ideology or the opinion or perspective of the speaker is

Complaint for Declaratory and Injunctive Relief

the rationale." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). It does not matter if the retaliation or discrimination is unsuccessful at chilling the target's speech. The constitutionality of discriminatory and retaliatory action cannot turn on "the plaintiff's will to fight." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005).

26. Similarly, a law violates the First Amendment if it was enacted to discriminate or retaliate against an individual for his politics. *See Branti v. Finkel*, 445 U.S. 507, 516-17 (1980). This prohibition "reflects the First Amendment's hostility to government action that prescribes what shall be orthodox in politics." *Heffernan*, 136 S. Ct. at 1417 (cleaned up). Laws based on partisan discrimination or retaliation "press" individuals "to conform their beliefs and associations to some state-selected orthodoxy." *Rutan*, 497 U.S. at 76.

27. These constitutional rules are implicated whenever speech or politics motivated the legislation "at least in part." *Cruise-Gulyas v. Minard*, 918 F.3d 494, 497 (6th Cir. 2019). To determine whether an impermissible purpose exists, courts first look at the "face" of the law to see if, for example, it has been "'gerrymander[ed]'" to target particular individuals. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533-34 (1993). "Facial neutrality" is "not determinative," however. *Lukumi*, 508 U.S. at 533-34. An impermissible purpose can also be detected from "the effect of a law in its real operation" and other evidence in "the record." *Id*. at 535; *Sorrell*, 564 U.S. at 564. "Relevant evidence includes, among other things, the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Lukumi*, 508 U.S. at 540.

**D. The Ethics in Government Act preempts States from imposing their own financial disclosure requirements on elected officials and candidates for office.**

28. The Ethics in Government Act ("EIGA") requires, among other things, candidates for President to disclose personal financial information. 5 U.S.C. App. 4 § 101(a).

29. The disclosures the EIGA requires include extensive financial information such as the source, type, and amount of all income, gifts, interest in property, and liabilities to creditors.

7

5 U.S.C. App. 4 § 102. The EIGA does not require the disclosure of tax returns.

30. The EIGA supersedes all other similar federal or state disclosure laws. Its "provisions … requiring the reporting of information shall supersede any general requirement under any other provision of law or regulation with respect to the reporting of information required for purposes of preventing conflicts of interest or apparent conflicts of interest." *See* 5 U.S.C. App. 4 § 107(b).

**II. California Passes SB27 in a Partisan Effort to Obtain the President's Tax Information.**

**A. The Democrats' ongoing crusade to obtain the President's federal tax returns in the hopes of finding something they can use to harm him politically.**

31. During the 2016 election season, then-candidate Trump disclosed extensive information about his finances pursuant to the EIGA. His 2015 financial disclosure spans over 90 pages and includes hundreds of entries listing assets and income, bank accounts and investments, financial transactions, liabilities, and the ownership structures of his companies. His 2016 financial disclosure spans over 100 pages.

32. Having disclosed such extensive financial information, then-candidate Trump declined to disclose his federal tax returns, citing ongoing IRS audits and the need to not prejudice his rights in those proceedings. The Democrats—hoping to harm him politically in the Presidential race—made his tax returns a major campaign issue. Secretary Clinton repeatedly insinuated that their nondisclosure suggested they contained politically damaging information. As she framed the criticism at one Presidential debate: "[W]hy won't he release his tax returns? … Maybe he's not as rich as he says he is. Second, maybe he's not as charitable as he says he is. Third, we don't know all of his business dealings …. Or maybe he doesn't want the American people ... to know that he's paid nothing in federal taxes. ... It must be something really important, even terrible, that he's trying to hide."

33. During the election, now-Governor Gavin Newsom repeatedly highlighted the issue in a similar way. For example, he tweeted on May 12, 2016: "Folks think @realDonaldTrump is avoiding tax release because he pays a very low rate. I think its because his finances are a house of cards."

Complaint for Declaratory and Injunctive Relief

34. He later tweeted on September 21, 2016: "47 days to Election Day. Still no tax returns. @realDonaldTrump - I challenge you to prove us all wrong, show us you are not hiding anything." The next day he tweeted: "It's now September 22nd, and we haven't seen anything from you. Where are your tax returns, @realDonaldTrump? What are you hiding?"

35. Ultimately, the Democrats lost this political fight in the 2016 election. Voters heard the political attacks from Secretary Clinton and others, and they elected President Trump anyway. Democrats across the country, however, have only become more eager to obtain the President's tax returns for political gain.

**B. California Democrats' efforts to obtain President Trump's federal tax returns.**

   **i. California Governor Jerry Brown vetoes SB27's predecessor bill in 2017 because of concerns about its legality.**

36. The California legislature proposed the Presidential Tax Transparency and Accountability Act in 2017. The bill, also known as SB149, would have required President Trump to release his tax returns as a condition of appearing on the California primary ballot.

37. SB149's co-authors were state Senators Mike McGuire and Scott Wiener. In a joint op-ed touting SB149, they made clear the bill's target was President Trump: "We stand with the Tax Day protesters calling for President Trump to release his tax returns …. President Trump's disregard for this tradition is alarming … . Once [our bill] becomes law, if President Trump ever wants to appear on the California ballot again, he will need to do what presidential candidates have done for decades before him—be open and honest about his finances with the American people."

38. Senator Scott Wiener later reaffirmed SB149's focus after it passed the California legislature: "Our bill requiring presidential candidates to disclose tax returns is on the Governor's desk. No more Trump secrecy." He also revealed that the bill was meant to make the President's reelection more difficult: "If tax transparency, CA progressive values make Trump reelection harder, then I'm thrilled to be part of that effort."

39. Later, Senator Wiener admitted that the bill was a partisan effort targeting President Trump: "I authored only one bill that could be characterized as partisan: the presidential tax return bill. It applies to candidates of both parties, but because only Donald Trump refused to disclose,

there's an undertone. I will own that."

40. California's Office of Legislative Counsel—a nonpartisan public agency—advised that the bill would be unconstitutional if enacted. *See* Ops. Cal. Legis. Counsel, No. 1718407 (Sept. 7, 2017), Presidential Qualifications: Tax Return Disclosure.

41. Despite that conclusion, the Legislature passed the bill and sent it to Governor Jerry Brown for his signature.

42. Governor Brown, himself a Democrat, vetoed the bill because of its legal and political infirmities: "This bill is a response to President Trump's refusal to release his returns during the last election. While I recognize the political attractiveness—even the merits—of getting President Trump's tax returns, I worry about the political perils of individual states seeking to regulate presidential elections in this manner. … First, it may not be constitutional. Second, it sets a 'slippery slope' precedent. Today we require tax returns, but what would be next? Five years of health records? A certified birth certificate? High school report cards? And will these requirements vary depending on which political party is in power?"

43. Governor Brown recognized that conditioning ballot access on disclosing tax returns infringes a candidates constitutional rights: "A qualified candidate's ability to appear on the ballot is fundamental to our democratic system. For that reason, I hesitate to start down a road that will might lead to an ever escalating set of differing state requirements for presidential elections."

    **ii.    California passes SB27 under Governor Gavin Newsom.**

44. While current Governor Gavin Newsom was on the campaign trail, he stated that he supported the bill that Governor Brown vetoed. He also regularly highlighted that President Trump had not released his tax returns and insinuated that the President's reason for not doing so was because he was hiding something.

45. After Governor Newsom was elected, Senators Wiener and McGuire reintroduced a nearly identical version of the "Presidential Tax Transparency and Accountability Act," this time as SB27.

46. Senator Wiener reintroduced the bill because, as he explained, "Now we have a different governor. We want to give him the opportunity to weigh in, and hopefully he will sign it."

He also tweeted: "Today I'm joining Sen. Mike McGuire to announce a renewed effort to pass CA law requiring presidential candidates to disclose tax returns to appear on ballot. Trump's appalling display this week reminds us why it's important to know a presidential candidate's financial conflicts."

47.     As with its predecessor, SB27 requires presidential candidates to submit their tax returns from the five previous years as a condition of appearing on the ballot for primary elections. One of its stated purposes for imposing that obligation is to "provide voters with essential information regarding the candidate's potential conflicts of interest, business dealings, financial status, and charitable donations." Cal. Elec. Code § 6881.

48.     More specifically, Section 6883(a) of the law provides that "the Secretary of State shall not print the name of a candidate for President of the United States on a primary election ballot, unless the candidate, at least 98 days before the presidential primary election, files with the Secretary of State copies of every income tax return the candidate filed with the Internal Revenue Service in the five most recent taxable years."

49.     The California Republican primary is March 3, 2020. By its terms, then, SB27 requires President Trump to file his last five federal tax returns with Defendant Padilla on or before November 26, 2019.

50.     Section 6884(a)(2) forces candidates to provide their written "consent" to grant "the Secretary of State permission to publicly release a version of the candidate's tax returns."

51.     Section 6884(c)(3) provides that, within five days of receipt, "the Secretary of State shall make redacted versions of the tax returns available to the public on the Secretary of State's internet website." Those "tax returns shall be continuously posted until the official canvass for the presidential primary election is completed. Upon completion of the official canvass, the Secretary of State shall remove the public versions of the tax returns." Section 6884(c)(4) provides that the Secretary of State then "shall retain the paper copies of the submitted tax returns until the completion of the official canvass of the ensuring general election."

52.     Because SB27 applies only to primaries and not the general election, independent candidates are not forced to disclose their tax returns as a condition for running for President.

Complaint for Declaratory and Injunctive Relief

53.     SB27 passed the California legislature along partisan lines, with a 29-10 vote in the state Senate and a 57-17 vote in the state Assembly. Governor Newsom signed the bill into law on July 30, 2019.

54.     The California Constitution provides that statutes normally "go into effect on January 1 next following a 90-day period from the date of enactment of the statute." Cal. Const. art. IV, § 8(c)(1). There are limited exceptions to this rule that allow a statute to go into effect immediately. One of the exceptions is if it is an "urgency statute," which is a law "necessary for the immediate preservation of the public peace, health, or safety." Cal. Const. art. IV, §§ 8(c)(3), 8(d). The California legislature declared SB27 to be an urgency statute so it could go into effect immediately and in time for the upcoming primary.

55.     As with SB149, it is no secret that SB27 targets President Trump. Senator McGuire argued in support of the bill that "Presidential candidates need to put their own interests aside in the name of transparency. So far, our current president has done the opposite." He also stated in reference to SB27, "California didn't pick this fight. President Donald Trump has gone against 40 years of tradition … ."

56.     After Governor Newsom signed the bill, Senator McGuire tweeted, "Times up, @realDonaldTrump. If you want to be on the CA primary ballot, release your returns. It's a low bar to hit, unless you have something to hide." He also admitted in another tweet that President Trump was the "catalyst for the bill." And in yet another statement, Senator McGuire stated, "If he has nothing to hide, President Trump shouldn't be afraid to give American voters what they want, a copy of his tax returns."

57.     The Senate Judiciary Committee also confirmed that President Trump was the target. In a memo regarding the law's validity, the Committee specifically noted that the law was "prompted by Trump's" decision not to disclose his tax returns.

58.     Governor Newsom likewise made clear who the law's target was. Before signing the bill, he discussed whether President Trump would disclose his tax returns if the law were passed. And his signing statement likewise insinuated that SB27 was a response to the President: "These

are extraordinary times and states have a legal and moral duty to do everything in their power to ensure leaders seeking the highest offices meet minimal standards, and to restore public confidence. The disclosure required by this bill will shed light on conflicts of interest, self-dealing, or influence from domestic and foreign business interest." He reiterated in another statement that the law was meant to reveal whether there are any "conflicts of interest" that could affect the candidate's impartiality.

## CAUSES OF ACTION

### COUNT I
### Violation of the Presidential Qualifications Clause
### 42 U.S.C. § 1983

59. Plaintiffs incorporate all their prior allegations.

60. States cannot supplement the exclusive qualifications for President set forth in the text of the Constitution.

61. Requiring candidates for the Presidency to disclose their tax returns as a condition of appearing on a ballot is an unconstitutional qualification for office.

### COUNT II
### Violation of Presidential Electors Clause
### 42 U.S.C. § 1983

62. Plaintiffs incorporate all their prior allegations.

63. Even if SB27 is a ballot-access provision, States may only issue certain procedural regulations. SB27 exceeds California's authority to issue procedural regulations governing presidential elections. SB27 is thus ultra vires and unconstitutional legislation; California does not have the authority to implement it.

### COUNT III
### Violation of the First Amendment (Ballot Access)
### 42 U.S.C. § 1983

64. Plaintiffs incorporate all their prior allegations.

65. Even where States may issue ballot-access regulations in federal elections, they must exercise that authority consistent with the First Amendment. Severe restrictions must satisfy strict scrutiny, while lesser burdens require an assessment of whether alternative methods would

advance the proffered governmental interests.

66. SB27 cannot satisfy any level of First Amendment scrutiny. It fails strict scrutiny because it does not serve a compelling state interest and, in any event, is not narrowly tailored to that interest. It likewise fails any lower level of scrutiny because the EIGA's financial disclosure requirements are a less restrictive alternative that already serves whatever interest SB27 purports to serve.

## COUNT IV
### Violation of the First Amendment (Retaliation)
### 42 U.S.C. § 1983

67. Plaintiffs incorporate all their prior allegations.

68. The First Amendment prohibits laws enacted for the purpose of discriminating or retaliating against an individual for his politics or speech.

69. California officials have admitted, on countless occasions, that SB27's purpose is to expose the private tax information of one individual—President Trump—for political gain.

70. SB27 violates the First Amendment as it singles out President Trump because he is a Republican and a political opponent. It was enacted to retaliate against the President because of his policy positions, his political beliefs, and his protected speech, including the positions he took in the 2016 campaign.

## COUNT V
### Preemption by the Ethics in Government Act
### 5 U.S.C. App. 4 § 107(b)

71. The EIGA requires candidates for President to disclose financial information and "supersedes any other provision of law or regulation with respect to the reporting of information required for purposes of preventing conflicts of interest or apparent conflicts of interest." 5 U.S.C. App. 4 § 107(b).

72. SB27 requires candidates for President to disclose financial information in the form of the candidates' tax returns with the stated purpose of revealing a "candidate's potential conflicts of interest." SB27 thus is a "provision of law … with respect to the reporting of information required for purposes of preventing conflicts of interest or apparent conflicts of interest." EIGA therefore supersedes and preempts SB27.

Complaint for Declaratory and Injunctive Relief

**WHEREFORE,** Plaintiffs ask this Court to enter judgment in his favor and provide the following relief:

a. A declaratory judgment that SB27 violates the Presidential Qualifications Clause, the Presidential Electors Clause, the First Amendment, and the Ethics in Government Act;

b. A permanent injunction prohibiting Defendants from implementing and enforcing SB27;

c. A temporary restraining order and preliminary injunction granting the relief specified above during the pendency of this action;

d. Plaintiffs' reasonable costs and expenses, including attorneys' fees; and

e. All other preliminary and permanent relief that Plaintiffs are entitled to and to which the Court deems just and proper.

Dated: August 6, 2019                                          Respectfully submitted,

/s/ Bryan K. Weir
Bryan K. Weir, CA Bar #310964
Thomas R. McCarthy*
William S. Consovoy*
Cameron T. Norris*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423

*Application for admission
pro hac vice forthcoming

Complaint for Declaratory and Injunctive Relief