1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   JERRY GRIFFIN, MICHELLE              No.  2:19-cv-01477-MCE-DB
     BOLOTIN, MICHAEL SIENKIEWICZ,             *(and related cases)*
12   AND JAMES B. OERDING,                No.  2:19-cv-01501-MCE-DB
                                          No.  2:19-cv-01506-MCE-DB
13                Plaintiffs,             No.  2:19-cv-01507-MCE-DB
                                          No.  2:19-cv-01659-MCE-DB
14        v.

15   ALEX PADILLA, in his official capacity
     as Secretary of State of California,

16
                  Defendant.
17   ───────────────────────────────

18   AND RELATED CASES.

19

20        On July 30, 2019, California Governor Gavin Newsom signed into law the

21   Presidential Tax and Transparency Act ("the Act"), enacted as Senate Bill 27, which

22   requires, among other things, presidential candidates in the California primary to have

23   disclosed their federal tax returns for the previous five years as a precondition to

24   appearing on the State's partisan primary ballot.[1]  By way of the above-captioned related

25   actions, five sets of Plaintiffs seek to enjoin enforcement of that law by Defendants

26   Governor Newsom, Alex Padilla, California's Secretary of State, and Xavier Becerra, in

27   ────────────────────

28        [1] The Act was codified as Chapter 7 to Part 1 of Division 6 of the California Elections Code, §§ 6880 et seq.

1

1   his capacity as California Attorney General.[2]  Plaintiffs are the incumbent President,

2   Donald J. Trump, along with his reelection campaign, a second Republican candidate for

3   President, Roque De La Fuente, both the Republican National Committee and its state

4   counterpart, the California Republican Party, and eight individual California voters,

5   including members of both the Republican, Democratic and Independent Parties.

6        According to all Plaintiffs, the Act violates the so-called Qualifications Clause of

7   the United States Constitution.  U.S. Const., art, II, § 1, cl. 5 ("Qualifications Clause").

8   Four of the five lawsuits further allege that the Act violates Plaintiffs' First Amendment

9   rights to associate and/or to access the ballot, also guaranteed by the United States

10   Constitution.  In addition, two of the actions take the position that the Act also violates

11   the Fourteenth Amendment's Equal Protection Clause.  Finally, the lawsuit filed on

12   behalf of President Trump and his campaign asserts that the Act's provisions are

13   preempted by the Ethics in Government Act of 1978, 5 U.S.C.A. App. 4, §§ 101 et seq.

14   ("EIGA"), which requires that presidential candidates disclose certain financial

15   information.

16        The Court heard oral argument on September 19, 2019, and, at the hearing's

17   conclusion, announced its tentative decision granting a preliminary injunction enjoining

18   application of the Act insofar as it pertains to presidential candidates.  This written order

19   memorializes that ruling and supersedes any and all statements made by the Court at

20   that time.  For the reasons set forth below, the requests for preliminary injunctive relief

21   are GRANTED.

22

23                  **BACKGROUND**

24

25        In 1913, the Sixteenth Amendment to the United States Constitution was ratified

26   authorizing a national income tax to be implemented through the filing of individual tax

27

28        [2] Newsom, Becerra and Padilla will be collectively referred to in this Memorandum and Order as "Defendants" or the "State" unless otherwise noted.

1   returns with the Internal Revenue Service.  Since that time, there has never been a legal

2   requirement that any candidate for federal office disclose their tax returns as a

3   precondition to standing for election.  The Act, which provides in relevant part as follows,

4   attempts to change that:

5           6883.   (a) Notwithstanding any other law, the Secretary of
6           State shall not print the name of a candidate for President of
        the United States on a primary election ballot, unless the
7           candidate, at least 98 days before the presidential primary
        election, files with the Secretary of State copies of every
8           income tax return the candidate filed with the Internal Revenue
        Service in the five most recent taxable years.

9   Cal. Elec. Code § 6883(a).  It goes on to require the Secretary of State to publish a copy

10   of the candidate's personal tax returns on the Secretary's publicly available website,

11   after redacting the returns for privacy purposes.  Id. at § 6884(c).  Because the Act

12   applies only to primaries and not to the general election, however, independent and

13   certified write-in candidates are not required to disclose their tax returns as a condition of

14   running for President.  Id. at §§ 8300, 8600.

15         The California Legislature formally explained its justification for passing the Act in

16   a purpose statement which reads:

17           [The] State of California has a strong interest in ensuring that
        its voters make informed, educated choices in the voting
18           booth.  To this end, the state has mandated that extensive
        amounts of information be provided to voters, including county
19           and state voter information guide.  The Legislature also finds
        and declares that a Presidential candidate's income tax returns
20           provide voters with essential information regarding the
        candidate's potential conflicts of interest, business dealings,
21           financial status and charitable donations.

22   Id. at § 6881.  Despite this attempt to couch the Act as an informational device to be

23   applied equally to all candidates, however, the legislative history and statements made

24   by state legislators during its consideration strongly suggest it was primarily intended to

25   force President Trump to disclose his tax returns.[3]  Indeed, at oral argument counsel for

26              [3] Trump has made extensive disclosures of his personal financial information in accordance with
the provisions of EIGA, but has never disclosed his tax returns themselves.   Additionally, when he
27   announced his candidacy for reelection in 2020, Trump reiterated that he would not disclose his filings
prior to either the 2020 primary or general elections.  See Pl. Melendez' Mot., 19-cv-01506-MCE-DB, ECF
28   No. 17-1, 6:12-17.

1    the State expressly conceded that the Act "was prompted by President Trump's refusal

2    to disclose his tax return when he ran for . . . office."  Transcript of September 19, 2019

3    hearing, ECF No. 37 to Case No. 19-cv-1477-MCE-DB, 55:12-15.  Likewise, State

4    Senator Mike McGuire, who co-sponsored the Act in the California Senate, has

5    unequivocally indicated that "it will make presidential tax returns public in [California] just

6    in time for the 2020 election."  Pl. Melendez' Mot., 19-cv-01506-MCE-DB, ECF No. 17-1,

7    at 5:26-27; 6:5-6.  McGuire has further stated that "President Trump, if he truly doesn't

8    have anything to hide, should step up and release his tax returns."  Id. at 5:28-6:1.

9            Defendants also describe the Act as having been enacted in response to

10   President Trump's "break" from "customary practice" in choosing not to disclose his

11   returns.  See Defs.' Omnibus Opp, 3:22-24.  But such production has hardly been

12   universal.  Between 1913, when income taxes were instituted, and 1973, when President

13   Nixon opted to disclose his returns after portions were leaked, no sitting President

14   elected to furnish his returns.  Melendez Mot. at 2:21-22.  In addition, Nixon's successor,

15   Gerald Ford, opted to disclose only a summary of his taxes.  Id. at 2:25.  Nor have

16   presidential candidates universally released their tax filings.  For example, in 1992,

17   former California Governor Jerry Brown, then a candidate for the Democratic nomination

18   for President, elected not to disclose his returns.  Ross Perot similarly declined to

19   disclose that same year, and in 2000, Ralph Nader also decided against disclosure.  Id.

20   at 2:28-3:8.  Consequently, the State's argument that the California Legislature passed

21   the Act "to codify a custom followed by presidential candidates in the past five decades"

22   is disingenuous.  Defs.' Opp., 1:6.

23           Against this backdrop, it is no surprise that the one other time California

24   attempted to pass a law such as the one challenged here, shortly after President

25   Trump's election, it was unsuccessful.  More specifically, in 2017, the California

26   Legislature passed a bill known as SB 149 that, like the Act, would have required

27   candidates to release their returns as a precondition for appearing on the California

28   primary ballot.  In analyzing that legislation before it came to a vote, however,

4

1  California's Office of the Legislative Counsel—a nonpartisan public agency— "concluded

2  that [SB 149] would be unconstitutional if enacted."  Cal. Comm. on the Judiciary Report,

3  Senate, March 11, 2019 at 5 (citing Ops. Cal. Legis. Counsel, No. 1718407 (Sept. 7,

4  2017)).  Regardless, the Legislature approved the bill anyway and sent it to then-

5  Governor Jerry Brown for his signature.  Governor Brown then vetoed the legislation,

6  articulating his many reservations as follows:

7
> This bill is a response to President Trump's refusal to release
8  his returns during the last election.  While I recognize the
   political attractiveness – even the merits – of getting President
9  Trump's tax returns, I worry about the political perils of
   individual states seeking to regulate presidential elections in
10 this manner.  First, it may not be constitutional.  Second, it sets
   a 'slippery slope' precedent.  Today we require tax returns, but
11 what would be next?  Five years of health records?  A certified
   birth certificate?  High school report cards?  And will these
12 requirements vary depending on which political party is in
   power?

13

14  Governor Jerry Brown, Governor's Veto Message, SB 149, available at

15  https://leginfo.legislature.ca.gov/faces/billStatusClient.xhtml?bill_id=201720180SB149.

16  He concluded that conditioning ballot access on the disclosure of tax returns might

17  infringe upon settled constitutional rights, stating that "[a] qualified candidate's ability to

18  appear on the ballot is fundamental to our democratic system."  Id.  Accordingly, he

19  "hesitate[d] to start down a road that well might lead to an ever escalating set of differing

20  state requirements for presidential candidates."  Id.

21        Despite both Governor Brown's warning and the Legislative Counsel's earlier

22  admonition, the lead authors of SB 149 announced their intent to reintroduce the bill

23  when California had a new Governor.  See McCarthy Decl, Case No. 2:19-cv-01501-

24  MCE-DB, ECF No. 10-2, ¶¶ 5-6.  And follow through they did, introducing the present

25  Act on December 3, 2018, less than a month after Governor Newsom was elected to

26  office.  Like its predecessor, the Act was again denominated as "the Presidential Tax

27  Transparency and Accountability Act" and contained the same material provisions as the

28  ///

1  earlier SB 149, requiring partisan candidates to submit their tax returns from the five

2  previous years in order to appear on the primary ballot.[4]

3      Significantly, although no other state has enacted a requirement such as the one

4  at issue here,[5] California pushed the envelope even further by passing the Act as an

5  "urgency statute" that would go into effect immediately.[6]  The Act was deemed "urgent"

6  in this regard even though California had been conducting presidential primary elections

7  without a tax disclosure requirement since the dawn of American income taxes more

8  than one hundred years prior.

9      Given the current date for California's 2020 presidential primary, and the fact that

10  under the terms of the Act tax returns must be released 98 days beforehand, absent

11  injunctive relief, partisan candidates must disclose their taxes by November 26, 2019, in

12  order to appear on the California primary.  The instant motions seek to enjoin that

13  requirement.

14

15                              **STANDARD**

16

17      "A preliminary injunction is an extraordinary and drastic remedy."  Munaf v. Geren,

18  553 U.S. 674, 690 (2008).  "[T]he purpose of a preliminary injunction is to preserve the

19  status quo between the parties pending a resolution of a case on the merits."

20  McCormack v. Hiedeman, 694 F.3d 1004, 1019 (9th Cir. 2012).  A plaintiff seeking a

21  _____

22      [4] The Act differs somewhat from SB 149 in that the former contains more specific directions on
    how candidates must present their tax returns to the California Secretary of State.  In addition, the Act also
23  applies to state gubernatorial candidates who wish to participate in the primary election.  All parties agreed
    at the September 19, 2019, hearing, however, that the present challenges pertains only to the Act's
24  application to presidential primaries.

25      [5] On May 1, 2017, Governor Chris Christie vetoed a similar bill, S3048, passed by the New Jersey
    Legislature.  Melendez Mot., 3:24-25.

26      [6] The California Constitution normally provides for new laws to "go into effect on January 1 next
    following a 90-day period from the date of enactment of the statute (Cal. Const., art. IV, § 8(c)(1), but by
27  denominating the statute as one of urgency "necessary for immediate preservation of the public peace,
    health, or safety" (id. at § 8(c)(3), 8(d)), the Act applied immediately and in time for California's March 3,
28  2020 primary.

1   preliminary injunction must establish that he is (1) "likely to succeed on the merits;"

2   (2) "likely to suffer irreparable harm in the absence of preliminary relief;" (3) "the balance

3   of equities tips in his favor;" and (4) "an injunction is in the public interest."  Winter v.

4   Natural Res. Defense Council, 555 U.S. 7, 20 (2008); see also Short v. Trown, 893 F.3d

5   671, 675 (9th Cir. 2018).  "If a plaintiff fails to meet its burden on any of the four

6   requirements for injunctive relief, its request must be denied."  Sierra Forest Legacy v.

7   Rey, 691 F. Supp. 2d 1204, 1207 (E.D. Cal. 2010) (citing Winter, 555 U.S. at 22).  "In

8   each case, courts 'must balance the competing claims of injury and must consider the

9   effect on each party of the granting or withholding of the requested relief.'"  Winter,

10   555 U.S. at 24 (quoting Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987)).  A

11   district court should enter a preliminary injunction only "upon a clear showing that the

12   plaintiff is entitled to such relief."  Winter, 555 U.S. at 22 (citing Mazurek v. Armstrong,

13   520 U.S. 968, 972 (1997)).

14         Alternatively, under the so-called sliding scale approach, "[t]he Ninth Circuit

15   weighs [the above] factors on a sliding scale", so that where there are "'serious

16   questions going to the merits' --- that is, less than a 'likelihood of success' on the merits -

17   -- a preliminary injunction may still issue so long as 'the balance of hardships tips sharply

18   in the plaintiff's favor' and the other two factors are satisfied."  Short v. Brown, 893 F.3d

19   671, 675 (9th Cir. 2018).

20         Where the moving party alleges constitutional violations, including violations of

21   rights secured by the First Amendment, they must make a "colorable claim" that their

22   rights have been infringed or threatened with infringement, but upon this showing "the

23   burden shifts to the government to justify the restriction."  Thalheimer v. City of

24   San Diego, 645 F.3d 1109, 1117 (9th Cir. 2019) (citing Klein v. City of San Clemente,

25   584 F.3d 1196, 1201 (9th Cir. 2009)).

26   ///

27   ///

28   ///

1

**ANALYSIS**

2

3      The Court appreciates the State's desire for transparency in the political process.

4  Requiring candidates to disclose tax returns could shed light on sources of income,

5  potential conflicts of interest, and charitable tendencies.  This information is important to

6  a voter's ability to evaluate how a candidate's financial interests might affect future

7  decision making.  For example, in what entities or countries have candidates invested?

8  Where have they donated?  Who do they owe?  These concerns are both legitimate and

9  understandable,[7] but are undermined when candidates offer unnecessary and irrelevant

10  excuses for shielding the public from such information.

11      It is not the job of the courts, however, to decide whether a tax return disclosure

12  requirement is good policy or makes political sense.  Those are questions delegated to

13  the political branches of the federal government, that is Congress and the President,

14  under Articles I and II of the United States Constitution.  Those are the branches that

15  make the law.  Article III Courts such as this one, on the other hand, are tasked with

16  interpreting the law and evaluating whether laws passed by the other two branches of

17  federal government or by the states are constitutional in the first place.  The job of the

18  federal courts is therefore to follow the law and to decide questions based on the United

19  States Constitution, which is the only thing the Court is being asked to do in these cases.

20  Courts created under Article III of the United States Constitution are not concerned with

21  political victories or who may or may not "win."  Instead, it is the Court's job to make sure

22  the Constitution wins.  To that end, while this Court understands and empathizes with

23  the motivations that prompted California to pass the Act, it concludes that a preliminary

24  injunction should nonetheless issue because the Act's provisions likely violate the

25  Constitution and the laws of the United States.

26  ///

27

28      [7] In fact, these are some of the same considerations our nation takes into account when evaluating individuals who have been confirmed by the United States Senate for security clearances.

1

**A.**     **Likelihood of Success on the Merits**

2

**1.     Qualifications Clause**

3

The Presidential Qualifications Clause of the United States Constitution sets forth

4

the eligibility requirements for the Office of President:

5

> No person except a natural born Citizen . . . shall be eligible to
> the Office of President; neither shall any person be eligible to
> that Office who shall not have attained to the Age of thirty five
> Years, and been fourteen Years a Resident within the United
> States.

6

7

8

U.S. Const., art. II, § 1, cl. 5.

9

The United States Supreme Court analyzed the Constitution's Qualifications

10

Clauses in the seminal case, U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779 (1995).

11

There the Court held that the Framers intended the foregoing language to "fix as

12

exclusive the qualifications in the Constitution," "thereby divest[ing] States of any power

13

to add qualifications."  Id. at 801, 806.  The Court reasoned that "the text and structure of

14

the Constitution, the relevant historical materials, and, most importantly, the "'basic

15

principles of our democratic system' all demonstrate that the Qualifications Clauses were

16

intended to preclude the States from exercising any such power . . . . "  Id. at 806.

17

Significantly, the Court rejected any notion that a state can cloak an otherwise

18

impermissible qualification as a ballot access issue subject to regulation by the states

19

under the Elections Clause,[8] stating that states cannot indirectly create new eligibility

20

requirements by "dressing eligibility to stand for [public office] in ballot access clothing."

21

Id. at 831.

22

Factually, the Term Limits Court was confronted with an amendment to the state

23

constitution of Arkansas which would have prohibited any candidate having served more

24

than three years in the United States House of Representatives, or two years in the

25

United States Senate, from appearing on the state's general election ballot for federal

26

congressional office.  The Court held this attempt to alter federal eligibility

27

28

---

[8] The Elections Clause allows states to set the "times, places and manner" of holding elections. U.S. Const., art I, § 4, cl. 1.

1  unconstitutional.[9]  In delineating the line between a state's permissible power to craft

2  procedural requirements designed to foster ballot access and its impermissible power to

3  create new substantive qualifications for federal office, the Term Limits Court noted that

4  a statute certainly crosses that line if it "has the likely effect of handicapping a class of

5  candidates and has the sole purpose of creating additional qualifications indirectly."  Id.

6  at 836.

7         The Ninth Circuit, in Schaefer v. Townsend, 215 F.3d 1031 (9th Cir. 2000), further

8  illuminated the applicable standard by explaining that a statute creates a new,

9  unconstitutional qualification for federal office if it either "create[s] an absolute bar to

10  candidates who would otherwise qualify," or "ha[s] the likely effect of handicapping an

11  otherwise qualified class of candidates."  Id. at 1035.  The regulation at issue there

12  required that candidates for federal office be registered voters, and therefore residents of

13  the State of California, at the commencement of any candidacy for federal office.

14  California took the position that the regulation was a mere ballot access restriction

15  passed under its authority to regulate the time, place, and manner of federal elections.

16  There, as here, the State argued that it had the power to adopt "generally-applicable and

17  evenhanded restrictions that protect the integrity and reliability of the electoral process

18  itself."  Id. at 1037 (quoting Anderson v. Celebrezze, 460 U.S. 780, 788 (1983)).

19         That court disagreed.  According to the Ninth Circuit, regulations passing

20  constitutional muster under the Elections Clause regulated election procedures only and

21  "did not even arguably impose any substantive qualification rendering a class of potential

22  candidates ineligible for a ballot position."  Id. at 1038 (citing Term Limits, 514 U.S. at

23  835).  While control over the procedural aspect of an election or requiring a candidate to

24         [9] The Term Limits Court noted that the provision at issue there applied only to congressional office
25  under Article I of the Constitution, but it strongly intimated that the same rationale applied with just as
   much force to the Qualifications Clause of Article II.  Indeed, the Court made clear that states "have just as
26  much right, and no more, to prescribe new qualifications for a representative, as they have for a
   president."  Id. at 803.  Moreover, the Court observed that the Qualifications Clauses "reflect the idea that
27  the Constitution treats both the President and Members of Congress as federal officers" over which the
   states only have delegated, as opposed to reserved, powers.  Id. at 805 n. 17.  The fact that the Term
28  Limits Court referred to "Qualifications Clauses" in the plural further suggests that its reasoning applies
   equally to presidential qualifications.

1  show a minimum level of support before running (and potentially crowding the ballot)[10]

2  may be permissible, <u>Schaefer</u> found that the residency requirement before it was not.

3  Instead, it plainly handicapped those candidates who did not comply and had the effect

4  of deterring them from running.  <u>Id.</u>

5       Similarly, although the Act challenged in this case does not present an absolute

6  bar to candidates running for office, it is equally clear that, like in <u>Schaefer</u>, it has the

7  likely effect of "handicapping" non-disclosing candidates.  The Act has nothing to do with

8  the extent of support a candidate may enjoy and plays no role in ensuring that

9  procedural integrity of the election.  To the contrary, it prevents a number of candidates

10  from appearing on the primary ballot absent disclosure of their tax returns, and in so

11  doing impairs their ability to win California's Republican presidential primary election, to

12  obtain the support of California's delegates to the Republican National Convention, and

13  to secure the party's nomination for President.  This complete denial of ballot access

14  constitutes a severe handicap because "there is no denying that the ballot restrictions

15  will make it significantly more difficult for the barred candidate to win the election."

16  514 U.S. at 831.[11]  It follows that barring candidates in this manner is the type of burden

17  that "demands serious constitutional scrutiny."   <u>Short v. Brown</u>, 893 F.3d at 677.

18       The State's Claim that the Act is a procedural "times, places and manner"

19  requirement permissible under the Elections Clause is simply not viable.  Unsurprisingly,

20  the <u>Term Limits</u> Court held that the Elections Clause implicitly prohibits states from

21  enacting provisions designed to benefit or to hinder certain candidates.  <u>Term Limits</u>,

22  514 U.S. at 833-34 ("[T]he Framers understood the Elections Clause as a grant of

23

24  ─────────────

       [10] <u>See, e.g.</u>, <u>Lubin v. Panish</u>, 415 U.S. 709, 715, 718-19  (1974) (a state may restrict ballot access to eliminate as many "frivolous candidac[ies]" as possible by requiring candidates to "demonstrat[e] the existence of some reasonable quantum of voter support" through, for example, petitions signed by voters);

25  <u>Ill State Bd. of Elections v. Socialist Workers Party</u>, 440 U.S. 173, 185 (1979) ("[W]e have upheld properly drawn statutes that require a preliminary showing of a significant modicum of support before a candidate

26  or party may appear on the ballot.").

27       [11] While the State argues that the disclosure requirement does not apply to the general election, that distinction does not save the Act since the Supreme Court has long held that constitutional requirements apply just as squarely to primaries as they do to the general election.  <u>See</u> <u>Tashjian v.</u>

28  <u>Republican Party</u>, 479 U.S. 208, 227 (1986).

1    authority to issue <u>procedural</u> regulations, and not as a source of power to dictate

2    electoral outcomes, to favor or disfavor a class of candidates, or to evade important

3    constitutional restraints") (emphasis added).  The procedural grant of power to the states

4    extended by the Elections Clause instead "encompasses matters like 'notices,

5    registration, supervision of voting, protection of voters, prevention of fraud and corrupt

6    practices, counting of votes, duties of inspectors and canvassers, and making and

7    publication of election returns.'" <u>Cook v. Gralike</u>, 531 U.S. 510, 523-24 (2001) (citing

8    <u>Smiley v. Holm</u>, 285 U.S. 355, 366 (1932)).

9         To the extent the Act mandates disclosure of tax returns to qualify for the

10   presidential primary, it does none of those things and, despite Defendants' best efforts, it

11   simply cannot be characterized as procedural.  Its provisions do not pertain to the

12   administration of an election (e.g., reducing ballot clutter by excluding candidates without

13   sufficient electoral support).  Nor can it be considered an even-handed restriction to

14   "protect the integrity and reliability of the electoral process itself" or to ensure "orderly,

15   fair, and honest elections" by providing financial information to voters.  <u>Term Limits</u>,

16   514 U.S. at 834.  If this was truly the State's even-handed objective, it presumably would

17   have passed some version of the Act in 1992, when former California Governor Jerry

18   Brown elected not to release his tax returns while running for the Democratic nomination

19   for President.  At base, the Act seeks to punish a class of candidates who elect not to

20   comply with disclosing their tax returns by handicapping their access to the electoral

21   process.[12] This is plainly impermissible.

22        The Supreme Court's decision in <u>Cook v. Gralicke</u>, 531 U.S. 510 (2001), is also

23   helpful in underscoring the conclusion that this Act is constitutionally impermissible.  In

24   that case, Missouri passed an initiative that required ballots to disclose whether federal

---

25          [12] The State's argument that a "class of constitutional concern" must be identified in order to entitle
26   a group of candidates to qualify for such protection, and that no qualifying class in that respect has been
     identified here, is unpersuasive.  Defs.' Opp, 8:25-27.  Despite the State's contention, no authority for any
27   such limitation has been identified.  Instead, by barring all qualifications other than those set out in the
     Constitution, the Framers exhibited concern for <u>all</u> "candidates who would otherwise meet the
28   requirements of the Qualifications Clause."  <u>Schaefe</u>r, 215 F.3d at 1035.  To read the phrase "class of
     constitutional concern" otherwise would nullify the Qualifications Clause.

1   candidates for the House and Senate supported Congressional term limits.  Id. at 514.

2   Missouri defended its legislation on grounds that it "merely regulated the manner in

3   which elections are held by disclosing information about congressional candidates" and

4   consequently was a valid exercise of Missouri's delegated power under the Elections

5   Clause.  Id. at 523.  The Supreme Court disagreed, finding that the law bore "no relation

6   to the 'manner' of elections as we understand it."   Id.  Instead, the law was "plainly

7   designed to favor candidates" supporting term limits in an attempt to handicap those

8   candidates who did not.  Id. at 524.  According to the Court, the Constitution's grant of

9   power to the states "to prescribe the procedural mechanisms for federal elections" does

10   not include the ability "to dictate electoral outcomes, to favor or disfavor a class of

11   candidates, or to evade important constitutional constraints."  Id. at 523.

12          Moreover, the Court pointed out, "by directing the citizen's attention to the single

13   consideration of the candidate's fidelity to term limits," the Missouri law implied that the

14   issue was "an important—perhaps paramount—consideration in the citizen's choice."  Id.

15   at 525.  It, therefore, could potentially, "decisively influence the citizen to cast his ballot

16   against candidates branded as unfaithful" to the idea of term limits.  Id.  Similarly in this

17   case, the Act draws undue attention to that class of candidates electing not to disclose

18   their tax returns, and by so doing operates to brand them as inferior.  As such, the Act

19   imposes an additional substantive qualification beyond the exclusive confines of the

20   Qualifications Clause and is likely invalid on that basis as well.

21          Furthermore, from a practical perspective, allowing individual states to potentially

22   adopt disparate and inconsistent qualifications for presidential primary candidates

23   tramples the Framers' vision of having uniform standards for the qualifications of those

24   individuals running for President.  Former California Governor Jerry Brown's admonition

25   in vetoing the Act's earlier iteration is particularly instructive on this point.  If allowed to

26   stand, the Act would potentially open the floodgates permitting each state to foreclose

27   ballot access to presidential candidates on various alleged informational grounds.  The

28   Court can easily foresee this extending far beyond tax information to the disclosure of

1  confidential medical records, psychiatric and therapist records, academic records, family

2  law records, or other privileged information.[13]  The list of allegedly "relevant" information

3  required to obtain ballot access could therefore snowball out of control with no practical

4  limitation as legislatures throughout the nation could impose their own qualifications on

5  presidential candidates, perhaps for nakedly political purposes.  That result cannot

6  possibly comport with the Framers' goal for a fixed and nationwide standard for such

7  federal offices.

8          Finally, in this day and age of partisan politics, evaluating the constitutionality of

9  the Act is one of the most non-partisan questions of which the Court can conceive.  At

10 oral argument, there were repeated references to this being a "Republican" issue, but

11 the protections afforded by the Qualifications Clause extend to all candidates

12 irrespective of their political affiliation.  While this case concerns a law passed by a

13 Democratic majority in the California Legislature, and while it fundamentally targets a

14 Republican presidential candidate, in a different political climate or a different state the

15 roles and putative requirements could easily be reversed.  The dangerous precedent set

16 by this Act, allowing the controlling party in any state's legislature to add substantive

17 requirements as a precondition to qualifying for the state's presidential primary ballot,

18 should concern all candidates alike, Republican, Democrat, or otherwise.  It certainly

19 concerns the Court.  But ultimately, neither the Constitution nor the Court are concerned

20 with which party a candidate or voter most closely aligns.  As such, for all of the reasons

21 set forth above, the Court finds that Plaintiffs are likely to prevail on their contention that

22 the Act violates that Clause.

23 ///

24 ///

25          [13] It is not difficult to imagine that a state could find, for example, just as compelling a reason to

26 force release of a candidate's mental and physical health records for "informational" purposes, particularly
   where a candidate might be older or have some preexisting health concerns.  The troubling minefield this

27 presents is all too apparent in terms of permitting each state to make its own informational demands.
   While there is little analytical difference in terms of the Act's stated "informational" purpose from the

28 alleged "information" that such records might provide, the invasion of privacy concerns would make any
   such mandate almost assuredly unconstitutional.

14

1          **2.     First Amendment Rights of Association and Ballot Access**

2          The Constitution guarantees, among other things, "the right of individuals to

3    associate for the advancement of political beliefs, and the right of qualified voters,

4    regardless of their political persuasion, to cast their votes effectively." Ill. State Bd. of

5    Elections, 440 U.S. at 184 (quoting Williams v. Rhodes, 393 U.S. 23, 30 (1968)).  Ballot

6    access restrictions "implicate the right to vote" because "limiting the choices available to

7    voters . . . impairs the voter's ability to express their political preferences." Id.  The rights

8    of individual voters to associate with, and vote for, the candidate of their choice "rank

9    among our most precious freedoms." Williams, 393 U.S. at 30-31 (citing Wesberry v.

10   Sanders, 376 U.S. 1, 17 (1964)).  Moreover, as the Supreme Court also noted, the

11   "freedom to associate as a political party" also "has diminished practical value if the party

12   can be kept off the ballot." Ill. State Bd. Of Elections, 440 U.S. at 184.

13         According to Plaintiffs, by barring partisan presidential candidates who decline to

14   release their tax returns from appearing on the California primary ballot, the Act imposes

15   a severe burden on voters' ability to access the ballot and vote for the candidate of their

16   choice.  Additionally, President Trump further claims that the Act similarly burdens his

17   ability to appear on the Republican primary ballot and to associate with Republican

18   voters in California.  The Trump Campaign as well as the Republican National

19   Committee and the California Republican Party make similar arguments.

20         To evaluate these arguments, the Court applies the so-called Anderson/Burdick

21   test established by the Supreme Court in Anderson v. Celebrezze, 460 U.S. 780 (1983)

22   and Burdick v. Takushi, 504 U.S. 428 (1982).  To the extent that voting rights "are

23   subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a

24   state interest of compelling importance,'" with a strict level of scrutiny therefore imposed.

25   Burdick, 504 U.S. at 434 (quoting Norman v. Reed, 502 U.S. 279, 289 (1992)).  Should

26   the restriction at issue trigger less than strict scrutiny, a balancing test is instead

27   employed.  Courts must weigh 1) the character and magnitude of the asserted injury to

28   the rights protected by the First and Fourteenth Amendments; 2) the precise interests

1    and justifications put forward by the state for the imposed ballot restriction; and 3) the

2    extent to which the state's interests make it necessary to burden the plaintiff's rights.

3    See Anderson, 460 U.S. at 789.  Even restrictions that impose a lesser burden in this

4    regard must be reasonably related to furthering the state's important regulatory interests.

5    Chamness v. Bowen, 722 F.3d 1110, 1116, (9th Cir. 2013).  To the extent the

6    presidential race is national in scope, a state's interests in regulating presidential

7    elections is weaker than for purely statewide elections.  Anderson, 460 U.S. at 795.[14]

8         Here, the Act creates what amounts to a functional bar against the ability to cast

9    an effective vote for a candidate who elects not to disclose his or her tax returns.  It

10   further interferes with the ability of both individuals and political parties to select the

11   individual presidential candidate of their choice to act as the "standard bearer who best

12   represents [their] ideologies and preferences."  Eu v. San Francisco Democratic Comm.,

13   489 U.S. 214, 224 (1989).[15]  In this case that includes the incumbent President of the

14   United States.  These are severe restrictions, since limitations on ballot access can

15   violate multiple constitutionally-protected interests, including the right to associate for

16   political purposes, the right to vote, and the right to express political preferences.[16]

---

17   [14] While the State disagrees, insisting that 'the Act regulates only California's presidential primary
     election, the result of which is determined by in-state voters" (Defs.' Opp, 11:21-23), that argument misses
18   the mark.  As a practical matter, presidential primaries impact the primaries in other states and therefore
     impact the general election as well.  Indeed, California's recent change in moving its primary from June to
19   March appears in part to have been intended to garner more say in the national nominating process.  See
     SB 568 Primary Elections:  Election Date, California Legislative Information, "Bill Analysis" Tab, Assembly
20   Floor Analysis 2 (Sept. 13, 2017).

21   [15] It is also no small matter that where, as here, the limitation on ballot access involves a
     candidate at the top of the primary ticket in California.  A restriction on the ability to vote for that candidate
22   could likely depress the party's voter turnout in general, and therefore adversely affect down-ballot
     congressional and state-level candidates as well.  This is particularly true in California since voters
23   approved a "Top Two Primary" system, where the two candidates receiving the most votes in the primary
     proceed to the general election regardless of their party affiliation.  See Bryant Decl., Case No.19-cv-1506-
24   MCE-DB, ECF No. 17-3, ¶¶ 11-13.

25   [16] The State nonetheless contends that any burden is only "slight" because all candidates are able
     to disclose their financial interests if they choose to do so.  But that is not the point.  The logistical burdens
26   of disclosure in this case are minimal compared to the burden of constitutional concern, which is forcing
     candidates to make the choice between running for President and disclosing their tax returns.  See
27   Schaefer, 215 F.3d at 1037 (forcing out-of-state candidates to choose between relocating or being barred
     from the ballot constituted an impermissible qualification).  States cannot avoid the First Amendment's
28   protections by disingenuously characterizing a condition as "voluntary," when it is fact coerced.  See Term
     Limits, 514 U.S. at 829 ("As we have often noted, constitutional rights would be of little value if they could

1  Ill. State Bd. Of Elections, 440 U.S. at 184; Chamness, 722 F.3d at 1116 (a measure

2  which "significantly impairs" ballot access "imposes a severe First Amendment

3  restriction").[17]  As such, they are subject to strict scrutiny.

4      The fact that a candidate can still conceivably qualify for the primary as a write-in

5  or independent candidate does not change that calculus.  See Anderson, 460 U.S. at

6  799 n.26 ("We have previously noted that [a write-in] opportunity is not an adequate

7  substitute for having the candidate's name appear on the printed ballot."); Term Limits,

8  514 U.S. at 831 ("[E]ven if petitioners are correct that incumbents may occasionally win

9  reelection as write-in candidates, there is no denying that the ballot restrictions will make

10  it significantly more difficult for the barred candidate to win the election.").

11      Nor can Defendants show that the Act is either narrowly drawn or serves a

12  compelling state interest.  To the extent that the State argues that a candidate's asserted

13  "choice" in deciding whether to disclose tax returns makes the restriction narrow in

14  scope, the Supreme Court's decision in Cook is instructive.  There, as indicated above,

15  the Supreme Court struck down a Missouri constitutional amendment which directed the

16  Secretary of State to identify on the ballot those candidates who did not support federal

17  term limits.  That was also a "voluntary" act that the Court struck down as

18  unconstitutional.  Yet this case goes even further in keeping a candidate's name off the

19  ballot entirely, and Cook's finding of unconstitutionality therefore applies with even more

20  force here.

21      Moreover, the Cook Court also rejected the argument that Missouri's purported

22  objective in educating or notifying voters as to a candidate's stance on terms limits was

23  compelling.  While a state may educate voters as to the "procedural mechanisms" for

24  be indirectly denied").  Moreover, the fact that candidates may be able to disclose their tax returns if they

25  so choose does not change the fact that voters also have a First Amendment right to associate with and
nominate candidates who refuse to do so.

26  [17] Requiring presidential candidates to disclose tax returns in order to exercise First Amendment

27  rights to access voters is a severe burden both because of the fundamental nature of those rights and
since, as the Ninth Circuit has recognized, "[a] tax return and related information contains many intimate
details about the taxpayer's personal and financial life" to which a taxpayer has a right of privacy.  United

28  States v. Richey, 924 F.2d 857, 861 (9th Cir. 1991).

1  federal elections, they cannot "dictate electoral outcomes, to favor or disfavor a class of

2  candidates" or "evade important constitutional restraints" under the guise of voter

3  education.  Cook, 531 U.S. at 531.  In this case, the State's interest in doing so in the

4  first place is further weakened by the fact that the Act purports to restrict access to the

5  federal presidential primary, where it "has a less important interest" in regulation than in

6  statewide or local elections since the outcome of the race "will be largely determined by

7  voters beyond the State's boundaries."  Anderson, 460 U.S. at 795.[18]  At the end of the

8  day a voter can simply decline to vote for a candidate who chooses not to release his or

9  her tax returns.  Simply allowing voters to make that choice without further interference is

10  clearly the narrowest, and least intrusive, approach of all.

11       The State's professed interest in voter education is somewhat specious in any

12  event because it does not extend to all candidates in every scenario.  Instead, the Act

13  applies only to party-affiliated candidates (exempting independent and write-in

14  candidates) and affects only the primary, and not the general, election.  If California

15  legitimately wanted to "provide voters with essential information regarding the

16  candidate's potential conflicts of interest" to help them make a more informed decision,

17  as the interest statement contained in Government Code § 6881 indicates, it would keep

18  the tax returns public through the general election and not remove them from the

19  Secretary of State's website once the primary election concludes.  It is also difficult to

20  see how the Act's mandate in directing production of tax returns is "narrowly drawn" to

21  protect the state's purported interest in ensuring that voters are informed as to potential

22  conflicts of interest when the provisions of EIGA already require candidates to submit

23  detailed financial information concerning the extent of income, gifts and property

24  holdings as well as the identification of any positions held in a business enterprise.  See

25  5 U.S.C.A. Appx. 4, § 102.  The State has not identified anything missing on an EIGA

26  disclosure that could be found on a tax return to serve the Act's purported interests.

27  _____
   [18] The fact that states have more leeway in regulating congressional elections under the Elections
   Clause than they do in presidential elections is therefore not surprising.  See, e.g., Arizona v. Inter Tribal
28  Council of Arizona, Inc., 570 U.S. 1, 8 (2013); Rucho v. Common Cause, 139 S. Ct. 2484, 2495 (2019).

1    Accordingly, the Court concludes that Plaintiffs are likely to prevail on their claim that the

2    Act violates their First Amendment rights to freedom of association and ballot access.

3                **3.**      **Equal Protection under the Fourteenth Amendment**

4         The Fourteenth Amendment's Equal Protection Clause guarantees that "[n]o state

5    shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S.

6    Const., amend. XIV, § 1.  Two of the related cases, filed on behalf of the Griffin and

7    Melendez Plaintiffs (Case Nos. 2:19-cv-1477-MCE-DB and 2:19-cv-1506-MCE-DB,

8    respectively), argue that the Act is unconstitutional to the extent it requires a political

9    party's candidates for President to disclose his or her tax returns in the primary election

10    but exempts independent candidates from doing so.  By distinguishing among

11    constitutionally eligible candidates for President in that manner, Plaintiffs argue that the

12    Act imposes greater burdens on the voting and associational rights of California voters

13    who support major party candidates than those who support independents.  According to

14    Plaintiffs, this triggers equal protection concerns.  See Lubin v. Panish, 415 U.S. at 716

15    ("The right of a party or an individual to a place on the ballot is entitled to protection and

16    is intertwined with the rights of voters"); see also Matsumoto v. Pua, 775 F.2d 1393,

17    1396 (9th Cir. 1985).

18        In Anderson, the Supreme Court cautioned courts to carefully scrutinize laws

19    which impose "burden[s] that fall unequally on major-party and independent candidates."

20    460 U.S. at 793-94; see also Soltysik v. Padilla, 910 F.3d 438, 446 (9th Cir. 2018)

21    (recognizing that plaintiff had stated valid equal protection claim where state law

22    imposed an "unequal burden" on independent as opposed to party-affiliated candidates).

23    While distinctions in how the two groups are treated may be permissible, that is only the

24    case where those distinctions are constitutionally relevant.  Jenness v. Fortson, 403 U.S.

25    431, 441 (1971) (recognizing that the needs and potential of a political party with

26    historically broad support differ from a new or broad political organization, and that

27    consequently the latter may be exempt from having to establish all the criteria of a well-

28    established party in order to participate in primaries).

1    The Ninth Circuit has recognized, however, that independent candidates seeking

2    to run in the general election are "essentially similar" to partisan candidates seeking to

3    run in a party primary.  <u>Van Susteren v. Jones</u>, 331 F.3d 1024, 1027 (9th Cir. 2003).

4    Accordingly, there is no basis for subjecting the two groups to different burdens.  The

5    State lacks any valid interest in providing voters with more information about party-

6    backed candidates than independent candidates, especially when such requirements

7    can lead to the exclusion of only major party candidates from the ballot.  Consequently,

8    Plaintiffs are likely to succeed in demonstrating that the differing burdens are

9    unconstitutional under the Equal Protection Clause as well.

10              **4.     Preemption by the Ethics in Government Act ("EIGA")**

11   Finally as to the merits, and as already mentioned above, Title I of EIGA provides

12   for the disclosure of "source, type, and amount or value of income"; honoraria from any

13   source; dividends, rents, interest, and capital gains, and interests in property; the "entity

14   and category of value of the total liabilities owed to any creditor"; and the identity of all

15   positions held "as an officer, director, trustee, partner, proprietor, representative,

16   employee, or consultant of any corporation, company, firm, partnership, or other

17   business enterprise, any nonprofit organization, any labor organization, or any

18   educational or other institution."  <u>See generally</u> 5 U.S.C.A. App. 4, § 102.  Title I of the

19   EIGA also protects candidates from the need to make different or additional disclosure

20   by expressly displacing all other similar federal or state disclosure laws.  It expressly

21   "supersede[s] any general requirement under any other provision of law or regulation

22   with respect to the reporting of information required for purposes of preventing conflicts

23   of interest or apparent conflicts of interest."  <u>Id</u>. at § 107(b).

24   Like EIGA, by requiring production of a candidate's tax returns for the preceding

25   five years, the Act also purports to provide for the disclosure of extensive financial

26   information by candidates running for President, with one of its chief purposes being "to

27   provide voters with essential information regarding the candidates' potential conflicts of

28   interest, business dealings, financial status, and charitable donations."  Cal. Elec. Code

1  § 6881.  As such, according to the Trump Plaintiffs, the Act is plainly a "law or regulation

2  with respect to the reporting of information required for purposes of preventing conflicts

3  of interest" as described by EIGA, and by EIGA's express provisions it is preempted.

4  The State nonetheless claims that because § 107(b) makes no explicit reference

5  to preemption of state law, and because a previous version of the statute did explicitly do

6  so in another context, no preemptive intent should be inferred.  See Defs.' Opp., 27:21-

7  28:11.  In this regard, the State cites a presumption against preemption, in fields

8  traditionally occupied by the states, unless the clear and manifest purpose of Congress

9  suggests otherwise.

10  Defendants' statement of the law may be correct, but it has no bearing here

11  because regulation of federal officeholders is clearly not a field traditionally occupied by

12  the states.  Moreover, although the words "state" and "preemption" appear nowhere in

13  the text of § 107(b), the statute is nonetheless unambiguous.  Congress clearly intended

14  that the EIGA "supersede" state laws touching on the field of financial disclosures and

15  conflict-of-interest laws for federal officeholders.  "Supersede" means to "[o]bliterate, set

16  aside, annul, replace, make void, inefficacious or useless, repeal."  See Black's Law

17  Dictionary (6th ed. 1990).  Section 107(b) of EIGA therefore "set[s] aside" and

18  "replace[s]" "any general requirement under any other provision of law or regulation with

19  respect to the reporting of information required for purposes of preventing conflicts of

20  interest or apparent conflicts of interest."  By using the expansive term "any" with the

21  phrase "other provision of law or regulation," the plain and ordinary language of EIGA

22  unambiguously gives it preemptive force over the Act.[19]  Plaintiffs are accordingly likely

23  to prevail on the merits with respect to EIGA preemption as well.

24  **B.    Irreparable Harm**

25  Moving on to the remaining inquiries in evaluating whether preliminary injunctive

26  relief is warranted, the Court turns first to irreparable harm.  The Ninth Circuit has long

27  _____

28  [19] Given the statute's plain and ordinary meaning, any resort to legislative history is unnecessary.
See Conn. Nat'l Bank v. Germain, 503 U.S. 249, 254 (1992).

1   recognized that constitutional violations in general constitute irreparable harm.  See,

2   e.g., Stormans, Inc. v. Stelecky, 586 F.3d 1109, 1138 (9th Cir. 2009) ("constitutional

3   violations cannot be adequately remedied through damages" and therefore generally

4   constitute irreparable harm); Goldie's Bookstore, Inc. v. Super. Ct., 739 F.2d 466, 472

5   (9th Cir. 1984) (an alleged constitutional infringement by deprivation of equal protection

6   "will often alone constitute irreparable harm.").  This is particularly true in cases, like this

7   one, challenging candidate qualifications restricting ballot access.  See Matsumoto,

8   775 F.2d at 1395-96.  The rationale for such a finding is simple:  "If the plaintiffs lack an

9   adequate opportunity to gain placement on the ballot for this year's election, this

10   infringement on their rights cannot be alleviated after the election."  Council of Alternative

11   Political Parties v. Hooks, 121 F.3d 876, 883 (3d Cir. 1997).

12        The Ninth Circuit has further emphasized that "the loss of First Amendment

13   freedoms, for even minimal periods of time, unquestionably constitutes irreparable

14   injury."  Klein v. City of San Clemente, 584 F.3d 1196, 1208 (9th Cir. 2009).

15        Given the findings above that Plaintiffs are likely to prevail in establishing

16   constitutional violations premised on both the Qualifications Clause, First Amendment

17   rights of association and ballot access, and Fourteenth Amendment rights grounded in

18   equal protection, this Court finds that the requisite irreparable harm is present and that

19   this factor weighs in favor of granting a preliminary injunction.

20        **C.    Balance of Equities**

21        The balance of equities also weighs in Plaintiffs' favor.  The public interest served

22   by ensuring that individual voters may associate for the advancement of political beliefs

23   and cast a vote for their preferred candidate for President is extraordinary.  Williams,

24   393 U.S. at 30-31.  The State, on the other hand, "can derive no legally cognizable

25   benefit from being permitted to further enforce an unconstitutional limit on political

26   speech."  Sanders Cnty. Republican Cent. Comm. v. Bullock, 698 F.3d 741, 749 (9th Cir.

27   2012).  As the Ninth Circuit has explained, it is "clear that it would not be equitable or in

28   the public's interest to allow the state . . . to violate the requirements of federal law,

1   especially when there are no adequate remedies available." <u>Valle del Sol, Inc. v.</u>

2   <u>Whiting</u>, 732 F.3d 1006, 1029 (9th Cir. 2013).  Simply raising a "serious First

3   Amendment question[] compels a finding . . . that the balance of hardships tips sharply in

4   Plaintiffs' favor." <u>Am. Beverage Ass'n v. City & Cty. Of San Francisco</u>, 916 F.3d 749,

5   758 (9th Cir. 2019).  Therefore, a consideration of the balance of equities also points to

6   the propriety of a preliminary injunction in this matter.

7        **D.**    **Public Interest**

8        Finally, as the Ninth Circuit noted in <u>American Beverage</u>, "it is always in the public

9   interest to prevent the violation of a party's constitutional rights." <u>Id.</u> at 758.  This factor

10  accordingly also weighs in favor of an injunction here.

11

12                                                **CONCLUSION**

13

14       As set forth above, the Court finds that Plaintiffs are likely to prevail on the merits

15  of their arguments that the Act 1) violates the Presidential Qualifications Clause

16  contained in Article II of the United States Constitution; 2) deprives Plaintiffs of their

17  rights to associate and/or to access the ballot, as guaranteed by the First Amendment of

18  the Constitution; 3)  further violates the Constitution's Equal Protection Clause as set

19  forth in the Fourteenth Amendment; and 5) is preempted by the provisions of EIGA in

20  any event.

21       The Court further finds that Plaintiffs have demonstrated irreparable harm, have

22  shown that the balance of equities weighs in their favor, and have established to the

23  Court's satisfaction that the public interest tips in favor of enjoining implementation of the

24  Act insofar as it pertains to candidates for President of the United States.  Plaintiffs'

25  various Motions for Preliminary Injunction in the related cases are therefore GRANTED.

26  ///

27  ///

28  ///

1  Defendants are hereby ENJOINED from enforcing the provisions of the Presidential Tax

2  Transparency and Accountability Act to the extent they require candidates for the

3  presidency to disclose their tax returns as a condition of appearing on California's

4  presidential primary ballot.  <u>See</u> Cal. Elec. Code §§ 6883-6884.  No bond will be

5  required.

6       IT IS SO ORDERED.

7  Dated:  October 1, 2019

8

9          MORRISON C. ENGLAND, JR.
        UNITED STATES DISTRICT JUDGE